Filed 10/4/16  In re Kevin O. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re KEVIN O. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>KEVIN O. et al.,<br><br>    Appellants. | D069485<br><br>(Super. Ct. No. EJ1871DE) |
| In re SARAH R. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CHERYL O. et al.,<br><br>    Defendants and Appellants. | D070055<br><br>(Super. Ct. No. EJ1871CDE) |

CONSOLIDATED APPEALS from findings and orders of the Superior Court of San Diego County, Sharon L. Kalemkiarian, Judge. Affirmed.

Donna Balderston Kaiser, under appointment by the Court of Appeal, for Defendant and Appellant Cheryl O.

Christina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant Richard R.

Neale B. Gold, under appointment by the Court of Appeal, for Appellants Kevin O. and Tommy O, Minors.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Jesica Fellman, Deputy County Counsel, for Plaintiff and Respondent.

Cheryl O. and Richard R. appeal orders terminating parental rights to their children, Sarah R., Kevin O., and Tommy O., under Welfare and Institutions Code section 366.26.[1] Kevin O. and Tommy O. appeal orders granting Richard R. status as their presumed father under Family Code section 7611, subdivision (d) and ordering visitation. We consider the cases together.

Cheryl and Richard argue the juvenile court erred when it determined the beneficial parent/child relationship exception did not apply and terminated parental rights. We disagree. Richard's argument he had a beneficial parent/child relationship with Sarah, Kevin and Tommy is frivolous. Cheryl implicitly acknowledges she does not

---

[1] All further unspecified statutory references are to the Welfare and Institutions Code.

have beneficial parent/child relationships with Kevin and Tommy. She challenges the juvenile court's ruling as to Sarah but does not meet her burden on appeal to show error. We affirm the orders terminating parental rights.

Because we uphold the orders terminating parental rights, Kevin and Tommy's appeal challenging the juvenile court's orders granting Richard status as their presumed father and ordering visitation has been rendered moot. Nevertheless, we exercise our discretion to review the order granting visitation to Richard after the termination of reunification services as a matter of continuing public importance. We conclude that the visitation order, which was made during Kevin's and Tommy's transition to a concurrent planning home shortly before the section 366.26 hearing, was an abuse of discretion, resulting in a miscarriage of justice.

## FACTUAL AND PROCEDURAL BACKGROUND

Cheryl O. is the mother of Sarah R., Kevin O. and Tommy O. (together, children). The children are now ages nine, five and three years old, respectively. Sarah's father is Richard R. Cheryl and Richard are deaf and communicate in American Sign Language (ASL).[2] The children are not hearing impaired.

Cheryl and Richard were together at the time of Sarah's birth. When Sarah was approximately two months old, Richard was sentenced to five years in prison for assault with a deadly weapon causing great bodily injury. Kevin's alleged father was not

---

[2]    The parents were provided with interpreters throughout the case, both in and out of court. Any use of terms usually connoting verbal communication by the parents, e.g., "state," "testify," "said," etc. refers to communication using ASL.

involved in his life. Cheryl lived with Tommy's father, Timothy D., for three years. Prior to Tommy's birth, Cheryl left Timothy and resumed her relationship with Richard.

Richard has an extensive criminal history dating to 1989, including convictions for domestic violence, battery, grand theft, receiving stolen property, possession of a controlled substance, felon in possession of a firearm, violation of a restraining order, transportation of a controlled substance, and assault with a deadly weapon causing great bodily injury. He also had numerous probation violations, including inflicting corporal injury on a spouse and willful cruelty to a child. In April 2013, Richard violated his parole for chasing another person with a knife. He spent approximately four months in custody.

In September 2013, Richard, who was intoxicated, became angry when Sarah wet the bed. Richard pulled Sarah off the bed, threw the bed aside, and punched the glass doors on the television stand, injuring himself. The children were frightened. According to Richard's parole officer, Richard tested positive for methamphetamine several days before the incident.

Cheryl started using methamphetamine in 1995, when she was 18 years old. The Agency was concerned about Cheryl's history of having relationships with men who hurt her children. Cheryl was involved in dependency proceedings for her two older children after a boyfriend inflicted a severe brain injury on Cheryl's one-year old son.[3] Tommy's father sexually abused Sarah. Kevin's father used and sold drugs.

---

[3] Cheryl's parental rights to her two older children were terminated in 2002, and the children were adopted by their maternal grandparents.

4

The San Diego County Health and Human Services Agency (Agency) initiated dependency proceedings on behalf of the children.  Because Richard was out of the home as a condition of probation, the Agency allowed the children to remain in Cheryl's care on condition she not allow Richard to have any contact with the children.

Less than a month later, in Sarah's presence, Richard cut Cheryl's hand with a key when she asked for the car.  Cheryl told the social worker she was overwhelmed caring for three children, needed Richard to return home, and intended to maintain their relationship.  The juvenile court detained the children in protective custody and ordered the Agency to provide supervised visitation services to Cheryl and the children.

At the jurisdictional and dispositional hearings, the juvenile court sustained the petitions, removed the children from parental custody and ordered a plan of reunification services.  In Sarah's case, the juvenile court permitted Richard to have supervised visitation with Sarah with the concurrence of his parole officer.  The juvenile court did not address visitation between Richard and Kevin and Tommy.  Nevertheless, the Agency permitted Richard to visit with all the children because the children were placed together and the boys viewed Richard as a father figure.

Sarah was defiant, parentified and bossy.  She suffered from enuresis and encopresis.  Sarah did not have appropriate sexual boundaries with her brothers.   Shortly after starting therapy, Sarah disclosed that she had been sexually abused by Tommy's father and by Richard's older son, Jose.  Sarah described seeing her father cut her mother's hand with the car keys.  A short time later, Sarah looped a necklace she was wearing around her bedroom doorknob and tried to choke herself.  As a result of her

5

attempt to injure herself, the Agency removed Sarah from her foster home and her brothers, and placed her with an experienced foster parent.

Kevin was loud and rambunctious. He had a speech impediment. Tommy had delays in speech, fine motor skills and problem solving. He was referred for services. Kevin and Tommy were rough and physical boys. They hit each other. Kevin would bite Tommy.

Cheryl moved to a sober living facility in February 2014. In March, the social worker received a report that Cheryl was using methamphetamine and crack cocaine. Cheryl denied any drug use.

Richard left his sober living residence in December 2013. He relapsed on drugs in February or March. In April 2014, when meeting with the social worker, Richard refused to discuss reports he smelled of alcohol during several of his visits with the children. In May, Richard was hospitalized after his 18-year old son, Jose, stabbed him multiple times in the abdomen. During his recovery, he was unable to visit Sarah.

In reports prepared for the six-month review hearing, the social worker said Richard's and Cheryl's visitation with the children during the six-month review period was inconsistent. Cheryl cancelled visits shortly before they were scheduled. She cancelled at least one visit because she wanted to "sleep in." When Cheryl did not attend visits, Richard did not visit the children.

Sarah continued to display impulsivity, anxiety, and the inability to follow directions. Sarah talked about her brothers, who were in a different foster home, and worried about them. Sarah had a visit with Cheryl on July 1. Sarah was initially shy with

6

her mother, saying she had not seen her in a long time and she had missed her a lot. After a few minutes, Sarah kissed and hugged her mother. On July 16, when visits with Richard resumed, Sarah refused to visit him. On her way home, she cried and said she wanted to go home to her parents. Sarah was very affectionate with her mother during visits. They cuddled and played games. Sarah refused to visit Richard.

In August, the juvenile court found that Richard and Cheryl did not make substantive progress in their case plans and terminated reunification services. The juvenile court scheduled a section 366.26 hearing in December 2014. At that hearing, the Agency requested a continuance to assess permanency plans for the children. The children were still in two separate placements. Their respective caregivers were unwilling to adopt them. The social worker said the children were extremely bonded and she wanted to place them together in an adoptive home.

Cheryl tested positive for methamphetamine in February 2015.

The social worker reported Sarah's mental health was improving with therapy, services, medication and the continuous support of her foster mother. Kevin and Tommy were doing well in the placement. The children saw each other at their twice weekly visits with their mother. The children appeared happy to see their mother. Cheryl engaged with the children and they played throughout the visits. After the visits with Cheryl, Sarah would stay for a visit with her father. Before her visit with her mother ended, Sarah would say, "I don't want to visit with daddy." When the social worker asked Sarah why she did not want to visit her father, Sarah said she was afraid of him because of what he did to her mother. Kevin and Tommy would see Richard in the

7

distance when he arrived to visit Sarah. Cheryl would tell the boys to "wave to daddy." Kevin and Tommy did not display any emotional response to seeing Richard. They did not attempt to run toward him or hug him.

In May and again in July, Richard applied for presumed father status for Kevin and Tommy, and asked for visitation. A hearing on his requests was continued several times.

Cheryl tested positive for methamphetamine in September.

In October, the Agency identified potential adoptive parents for the children (caregivers). They introduced the children to the caregivers. In November, the children started visiting the caregivers at their home. They had an extended visit with the caregivers over the Thanksgiving holiday. The children appeared to be transitioning well and began calling the caregivers "mommy" and "daddy."

Cheryl relapsed on methamphetamine in November.

In December, the social worker reported that Cheryl continued to have regular visitation with Sarah, Kevin and Tommy, and there were no concerns about the visits. Richard's visits with Sarah appeared to have stabilized. He and Sarah had regular visits, and the Agency did not have any concerns about their interactions.

*Hearing on Richard's Request For Presumed Father Status*

The juvenile court held a hearing on Richard's request for presumed father status for Kevin and Tommy on December 11. Richard testified he always felt he was the father of all the children. He believed he was considered the father of the boys. Richard

8

did not understand the court did not consider him to be Kevin's and Tommy's father until November 2014. He said, "I am the father for these children."

The juvenile court inquired about translating the phrase "presumed father" from English to ASL. The interpreter said there was not an exact translation, and he had been using the concept "being named or called father for the two boys, not the real, not the biological father," and using the shorthand phrase "real father" when translating.

The parties argued whether Richard was required to file a section 388 petition to assert his paternity status. The juvenile court found that, with or without a section 388 petition, Richard met his burden to establish his status as Kevin's and Tommy's presumed father.

*Hearing on Richard's Request for Visitation*

At a contested hearing on December 17, 2015, the social worker said Kevin and Tommy had not lived with Richard for 26 months. In the last 14 months, Richard asked to visit the boys four times. The boys were having a smooth transition to their current placement. They were adjusting to living in a new home with new parental figures, and coping with losing their foster parents, with whom they had been living for 16 months. Reintroducing Richard to the boys at this time could confuse them and disrupt the relationship they were forming with a new family.

The social worker testified Tommy was working with a therapist to resolve a history of indiscriminate attachment. Tommy's attachment disorder presented a safety risk to him because he would run to people and hug and kiss them. His therapist was

9

working very closely with him and his caregivers to create healthy attachments in his current placement.

According to the social worker, Kevin had had several paternal figures in his life, including Richard, Tommy's father and his foster father. Kevin was just starting to adjust to his new caregiver as a potentially permanent father figure in his life. If Richard were reintroduced to Kevin, it might disrupt his bonding and attachment with his caregiver. Kevin referred to his caregiver as "daddy." Visitation would be confusing to the boys, allow internal conflicts to arise, and impede the attachment process.

The social worker believed visitation with Richard would be detrimental to the boys. She acknowledged Richard demonstrated a parental role during his visits with Sarah, and those visits had been positive.

Tommy's therapist said Tommy might not understand what Richard's role was or recognize him as a father figure. Kevin's therapist said she could not comment on visitation because she had not met with Richard. However, in general, it was preferable for young children to have one person or a set of people to focus on when forming a new attachment.

Cheryl testified Kevin and Tommy always called Richard "dad." When they saw Richard in passing on their Thursday visits, they would call out "dad, dad" and try to go to him.

Characterizing the evidence presented by the social worker and the boys' therapists as speculative, the juvenile court found there was no showing visitation would be detrimental to Kevin and Tommy. The court noted the boys visited with Richard until the

10

six-month hearing date, and those visits were not detrimental to them. The court ordered the Agency to provide one supervised visit a week.

Kevin and Tommy, through counsel, appealed the trial court's rulings granting Richard's requests for presumed father status and visitation.

*The Section 366.26 Hearing*

The 366.26 hearing began on January 7, and continued over six more days in January and February. The juvenile court admitted in evidence the Agency's court reports, family visitation narratives and logs, Sarah's stipulated testimony, and a letter from Richard. The juvenile court issued its ruling on March 21, after hearing closing arguments.

In reports prepared for the section 366.26 hearing, the Agency recommended the juvenile court terminate parental rights and free the children for adoption. Sarah, Kevin and Tommy were adoptable. In addition to approved adoptive families in San Diego County, the children were living with caregivers who wanted to adopt them. There were no concerns about the caregivers' ability to meet the children's needs. Sarah told the social worker she did a "good job" choosing a family for herself and her brothers.

The social worker did not believe Cheryl had beneficial parent/child relationships with her children. Kevin resisted visiting his mother and had to be encouraged to attend visits. Tommy said seeing his mother was "ok." On occasion, Sarah was reluctant to visit her mother.

The social worker testified she was assigned to the case on October 1, 2014. She fully informed the caregivers about the children's issues. Recently, Sarah had displayed

11

some concerning behaviors, such as biting, but her caregivers had worked through the issues with her and remained committed to adoption.

According to the social worker, Sarah appeared to be "very relaxed, very comfortable" and happy in her caregivers' home. The caregivers met all of Sarah's behavioral and emotional needs. The social worker did not believe that Sarah viewed her parents as parental figures. Sarah continued to tell the social worker about seeing her father cut her mother with car keys and how frightening that was for her. Sarah resisted visiting her father. When asked why she did not want to visit him, she said, "I don't know I just don't."

Sarah consistently said she wanted to live with her brothers. In March 2015 and again in early January 2016, Sarah said she wanted to go home to her mother. In January, when Sarah said she wanted to live with her mother, the social worker explained that Sarah was going to live in a safe home where someone would protect and care for her. Sarah's demeanor was unemotional. She appeared to accept the social worker's explanation and moved on to a different subject.

Kevin appeared to be blossoming. He did not act out. Kevin objected to visiting his mother. She did not meet his needs. Usually, he was standoffish with his mother, but was more affectionate with her on his last visit. Kevin did not want to visit Richard. He said, "I think I like it better if only Sarah and Tommy visit Daddy."

Tommy was removed from his parents when he was 16 months old. The social worker believed Tommy viewed Cheryl as someone he visited twice a week. Tommy did

not have a parent/child relationship with Richard. When asked who his father was, Tommy replied, "I don't have a dad."

Cheryl testified she saw her children twice a week. Tommy always ran to her saying "mom" in sign language. Kevin would give her a big hug, saying "mommy, mommy, mommy." Sarah called her "mom." Sarah asked when she could come home. She would get emotional. Cheryl tried to comfort her. Sarah would sit on her lap and Cheryl would tell her not to worry. When Sarah calmed down, Cheryl would help her with her homework.

Once in a while Kevin would become sad or upset. Cheryl would talk to him for a little while. He would calm down and go back to playing. Tommy ran to her when he saw her. She had to discipline him once in a while for throwing toys. Cheryl would teach colors and animals to Tommy, and she helped Kevin with his spelling.

Cheryl said she loved her children and wanted to keep them. She acknowledged she had made mistakes. Cheryl said she was tied to her children and treasured them. She was their mother.

Richard testified the children called him "dad." They wanted to come home. Richard said, "We want the kids with us . . . we want to be a family."

The juvenile court accepted Sarah's stipulated testimony.[4] In approximately September 2015, prior to the children's placement with the caregivers, Sarah said she would be sad if she could not see her brothers again. Sarah said she loved her father and

---

[4]     The parties stipulated to the admission of Sarah's statements. The record does not reflect the identity of the interviewer or the dates of the interviews.

13

her father loved her.  She was happy and excited to visit with her father.  She would be sad if she could not see her father again because he loved her.  During visits, Sarah hugged her mother and told her she loved her.  Her mother hugged her back and said she loved her.  Sarah missed her mother when she did not get to see her, and wanted to see her more often.  If Sarah could live with anyone she wanted, she would live with her brothers.  Sarah would feel sad and mad if she could not see her mother again.

In a second undated statement, Sarah said when she visited her mother, they played together and ate snacks.  She loved her mother and would be sad if she could not see her.  Her first choice was to live with her mother and brothers.  Her second choice was to live with her current caregivers and her brothers. Sarah did not know what adoption was.  After the interviewer explained to Sarah that adoption meant she would live forever with her caregivers and her brothers, but would not be able to see her parents again, Sarah was not sure she wanted to be adopted.  Sarah said if she were adopted by her caregivers and could not see her mother, she would be sad at first but could be happy again.

Sarah's therapist, Maria Teresa Kelley, L.C.S.W., testified she provided therapeutic services to Sarah for approximately two years.  Sarah was parentified.  She plummeted emotionally when she was separated from her brothers.  She talked about them nonstop and called them her "babies."  Sarah acknowledged visiting her father but said he was not in her life.  She spent very little time talking about her mother.   Sarah's enuresis increased after visiting her mother.

Sarah was relaxed and happy with her caregivers. She looked to her caregiver, Shawna, for physical and emotional care, comfort and affection. She was affectionate and playful with Shawna. Sarah was at ease. In Kelley's opinion, visits with her mother were detrimental to Sarah. They confused her and placed her back into the parental role. Every time Sarah visited her mother, Sarah reverted to parentified behavior.

Kelley testified Sarah had processed the concept of adoption and its consequences for visitation. She did not want to continue visiting her parents. Kelley said, "[Sarah] wants to be adopted and be in that forever home."

The children's caregiver, Shawna Z., testified the children had been in her care for three months. They were doing very well. The children were excited to be with each other. Usually, Sarah was excited to see her mother. After visits, Sarah was hyper, bossy and controlling with her brothers. The boys referred to Richard as "Sarah's dad." Kevin did not want to visit Richard, and would cry or throw a tantrum before visits. Tommy took his cue from Kevin but was generally willing to visit Richard. After visits, the boys were hyper and agitated. If a visit was cancelled, Kevin would be happy. He insisted Richard was not his dad. Tommy did not seem to care. Sarah would ask the reason the visit was cancelled, but the cancellations did not appear bother her. The boys did not talk about their parents. Sarah talked about her mother. She told Shawna about taking care of her brothers, and recently told her about the time her mother fainted and she took care of Kevin.

Shawna was working with Sarah to reduce her parentified behaviors. If Tommy cried, Sarah would run to pick him up. She felt it was necessary to get her brothers ready

to take a bath and brush their teeth. Shawna was working with the children to help them understand that she was the parent, not Sarah. Sarah was doing better. The children called Shawna "mommy," and her husband "daddy." Shawna and her husband were committed to adopting the children.

The juvenile court found that Cheryl faithfully and regularly visited the children and that Richard regularly visited the children, although his visitation was interrupted by legal proceedings. The juvenile court said it read every line of the visitation logs. The court found that Cheryl was loving with the children during visits, but the nature of the children's bond with her was problematic. The children, especially the boys, seemed ambivalent about visiting her. Sarah consistently expressed her love for her mother. However, her therapist's testimony was very credible. Sarah was parentified and did not turn to her mother for support, guidance or comfort. The court found that the benefits of a loving, stable home outweighed the bond the children had with Cheryl.

The juvenile court found that Kevin and Tommy did not recognize Richard as their father, and did not have a beneficial parent/child relationship with him. The court said Sarah's relationship with her father was one of "coming close and avoiding, coming close and avoiding," and found that Sarah's bond with her father did not outweigh the benefit she would gain from adoption. The juvenile court found that the children were adoptable, there were no exceptions that would make termination of parental rights detrimental to the children, and terminated parental rights.

Cheryl and Richard appealed from the orders terminating parental rights. On this court's own motion, we ordered the cases to be considered together.

16

# I

## DISCUSSION

### A

#### *The Appellants' Contentions*

Cheryl argues she met the statutory requirements to show she and Sarah have a beneficial parent/child relationship. Citing *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1315 (*Bailey J.*), she argues the reviewing court impermissibly imposed a nonstatutory "third prong" by requiring the juvenile court "to determine the importance of the [parent/child] relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption." (*Ibid.*) Cheryl contends reversal of the order terminating her parental rights to Sarah must necessarily result in the reversal of the orders terminating her parental rights to Kevin and Tommy because the three children are a bonded sibling group.

Richard asserts the juvenile court erred when it terminated parental rights because he demonstrated he had a beneficial parent/child relationship with Sarah, Kevin and Tommy. The parties join in each other's argument.

### B

#### *Legal Standards for Termination of Parental Rights and Standard of Review*

At a permanency planning hearing, the court may order one of three alternatives—adoption, guardianship or long-term foster care. (*In re S.B.* (2008) 164 Cal.App.4th 289, 296-297 (*S.B.*).) If a child is adoptable, there is a strong preference for adoption over the alternative permanency plans. (*Id.* at p. 297; *San Diego County Dept. of Social Services*

17

*v. Superior Court* (1996) 13 Cal.4th 882, 888.) If the court determines that a child is likely to be adopted, the burden shifts to the parent to show that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1). (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1343-1345.)

An exception to termination of parental rights applies where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) " '[B]enefit from continuing the [parent/child] relationship'. . . mean[s that] the [parent/child] relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H.,* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*).) "If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Ibid.*)

" 'The factors to be considered when looking for whether a relationship is important and beneficial are: (1) the age of the child, (2) the portion of the child's life spent in the parent's custody, (3) the positive or negative effect of interaction between the parent and the child, and (4) the child's particular needs.' (*In re Angel B.* (2002) 97 Cal.App.4th 454, 467, fn. omitted.) 'Interaction between natural parent and child will always confer some incidental benefit to the child. The significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation. [Citation.] The relationship arises from

18

day-to-day interaction, companionship and shared experiences.  [Citation.]  The exception applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent.' " (*Bailey J.*, *supra*, 189 Cal.App.4th at pp. 1315-1316.)

We apply the substantial evidence standard of review to the factual issue of the existence of a beneficial parental relationship, and the abuse of discretion standard to the determination of whether there is a compelling reason for finding that termination would be detrimental to the child.  (*In re Anthony B.* (2015) 239 Cal.App.4th 389, 395; *Bailey J.*, *supra*, 189 Cal.App.4th at pp. 1314-1315.)  We do not reweigh the evidence, evaluate the credibility of witnesses or resolve evidentiary conflicts.  (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.)

C

*Analysis*

1.  *A balancing test is required to determine the second prong of section 366.26, subdivision (c)(1)(B)(i).*

Cheryl argues the beneficial parent/child relationship exception requires only two findings: (1) the parent has regularly visited the child, and (2) the child would benefit from continuing the parent/child relationship. (§ 366.26, subd. (c)(1)(B)(i).) Cheryl argues that under *Bailey J*., the parent must prove (1) regular visitation, (2) the child would benefit from continuing the relationship, and (3) "the existence of that relationship constitutes a '*compelling reason* for determining that termination would be detrimental.' " (*Bailey J*., *supra*, 189 Cal.App.4th at p. 1315.) She contends the third prong is not required by statute. We are not persuaded by Cheryl's argument.

Section 366.26, subdivision (c)(1)(B) provides that an adoptable child must be freed for adoption by terminating parental rights unless the court finds "a compelling reason for determining that termination would be detrimental to the child . . . ." (*Ibid.*) One reason is defined as "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) Thus, the existence of a beneficial parent/child relationship exception is a compelling reason for not terminating parental rights.

Cheryl oversimplifies the meaning of "the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) In *Autumn H*., this court recognized that "[i]nteraction between natural parent and child will always confer some incidental benefit to the child." (*Autumn H., supra,* 27 Cal.App.4th at p. 575.) The *Autumn H*. court held

that " 'benefit from continuing the [parent/child] relationship' " means the parent/child "relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents."[5] (*Ibid.*)  This court further explained, "If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated."  (*Ibid.*)

In discussing the standard of review, the *Bailey J.* court explained the juvenile court's determination of the beneficial parent/child relationship exception is a " 'quintessentially' discretionary decision, which calls for the juvenile court to determine the *importance* of the [parent/child] relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption."  (*Bailey J.*, *supra*, 189 Cal.App.4th at p. 1315.)  This language does not impose a new requirement; rather, it is simply a concise restatement of long-standing case law that was first set forth in *Autumn H.*

*Bailey J.* states the juvenile court must assess "the detrimental impact that [the severance of the parent/child relationship] can be expected to have."  (*Bailey J.*, *supra*, 189 Cal.App.4th at p. 1315.)  This is equivalent to determining whether "severing the parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed."  (*Autumn H., supra,* 27

---

5      Cheryl does not challenge the applicability of *Autumn H.* in assessing whether the child would benefit from continuing the parent/child relationship.  To the contrary, she relies on *Autumn H.* in arguing Sarah would benefit from continuing their relationship.

Cal.App.4th at p. 575.) Similarly, weighing "the importance [of the parent/child relationship] . . . against the benefit to the child of adoption" (*Bailey J.*, at p. 1315) requires the same assessment as determining whether the parent-child relationship "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents" (*Autumn H.*, at p. 1315). Our analysis is supported by the *Bailey J.* court's reliance on *Autumn H.* in applying the law concerning the beneficial parent/child relationship exception to the facts of its case. (*Bailey J.*, *supra*, 189 Cal.App.4th at p. 1316.) To the extent any language in *Bailey J.* suggests there is a "third prong" in determining whether section 366.26, subdivision (c)(1)(B)(1) applies, it is mere dicta.

Here, the juvenile court assessed the beneficial parent/child relationship exception under *Autumn H.*, not under Cheryl's interpretation of *Bailey J.* After finding that the parents met the first prong of section 366.26, subdivision (c)(1)(B)(I), the juvenile court said, "The second step is for the Court to consider whether the parent/child bond is of a quality, and I'm referring to the language in the case of *Autumn H.*, and that is does the parental relationship promote the well-being of the child to such a degree as to outweigh the well-being the child gains in a permanent home?" The court said this meant a parent "who will protect the children, who will guide them, who will give them stability, dependability, sobriety . . . . [and] the chance to grow to be healthy and happy adults." Cheryl does not show error. The juvenile court correctly applied *Autumn H.* in determining whether the beneficial parent/child exception applied.

22

2.    *Cheryl does not meet her burden on appeal to show the juvenile court erred in terminating parental rights.*

Cheryl contends Sarah has a significant, positive and emotional bond with her. She argues Sarah continued to exhibit a fragile emotional state, and will be harmed if her bond with her is severed. Cheryl contends she proved the beneficial relationship exception under any standard, and reversal of the order terminating parental rights is required.

The record shows that Sarah spent a significant portion of her life in her mother's custody, and continued to be emotionally traumatized by her mother's failure to have maintained a safe home environment for her. Cheryl did not place Sarah's needs ahead of her own. Instead, Cheryl maintained relationships with violent and abusive men. As a result of Cheryl's inability to provide proper care and supervision to Sarah, Sarah suffered from enuresis and encopresis, had significant behavioral difficulties, and tried to injure herself. Her emotional and behavioral condition improved slowly with therapy, medication, stability and appropriate care.

Cheryl's visits with Sarah were inconsistent during the reunification period, but occurred regularly throughout the remainder of the proceedings. Their visits were pleasant and affectionate. Shortly before the section 366.26 hearing began, Sarah said she loved her mother and wanted to live with her. Sarah said she would be sad if she could not see her mother but she could be happy again. Although we agree with Cheryl the record shows that Sarah had an emotional bond to her, this is not sufficient, by itself, to establish that Sarah "would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i); *Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

23

Therapist Kelley believed Sarah's visits with her mother were detrimental to her because they confused her. Every time Sarah visited her mother, Sarah reverted to parentified behavior. Kelley believed Sarah had processed the concept of adoption. Kelley said, "[Sarah] wants to be adopted and be in that forever home." Sarah told the social worker she did a "good job" choosing a family for her and her brothers. Sarah quickly developed an affectionate relationship with her caregiver, and was "at ease" in her home. Recently, Sarah was sometimes reluctant to visit her mother and was not upset when visits were cancelled. The juvenile court did not abuse its discretion when it determined that continuing Sarah's relationship with her mother was outweighed by Sarah's needs for a stable, secure and safe home, and loving, dependable and sober parents.

3.      *Richard's argument he had beneficial parent/child relationships with the children is frivolous.*

Richard's argument he had beneficial parent/child relationships with Sarah, Kevin and Tommy is completely without merit. " 'Counsel and their clients have a right to present issues that are arguably correct, even if it is extremely unlikely that they will win on appeal.' [Citation.] However, an issue raised in an otherwise meritorious appeal may be held to be frivolous when ' "it indisputably has no merit—when any reasonable attorney would agree [it] is totally and completely without merit." ' [Citations.] This is an objective standard." (*In re Michael G.* (2012) 203 Cal.App.4th 580, 595.)

The record shows that Richard did not have a parental relationship with Sarah, Kevin and Tommy. "The positive and negative effect of interaction may be shown by such things as, despite regular visitation by the parent, the fact that a child repeatedly

24

expresses that he or she does not want to visit the parent. [Citation.] . . . Indifference to a parent, anger or detachment are also factors indicating the lack of the necessary positive relationship." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 467, fn. 4.)

Richard did not visit Kevin and Tommy from approximately May 2014 until December 2015. The record shows that during most of her dependency proceedings, Sarah did not want to visit Richard. When she acknowledged visiting him, she told her therapist her father was not in her life. Sarah remained traumatized by Richard's violence toward her mother. She did not express any desire to live with Richard, even after her visitation with him stabilized.

The record shows that the boys did not view Richard as their father. Kevin insisted Richard was not his father. He called Richard, "Sarah's dad." He was happy when their visits were cancelled. Kevin said, "I think I like it better if only Sarah and Tommy visit Daddy." When asked who his father was, Tommy replied, "I don't have a dad."

The record shows that Sarah's relationship with her father was conflicted at best, and she did not view him as being a part of her life. Richard's relationships with Kevin and Tommy were minimal, and the record clearly shows the boys did not view him as their father. On this record, no reasonable attorney would conclude that Richard had a beneficial parent/child relationship with Sarah, Kevin or Tommy in which the benefits of continuing their attenuated relationship outweighed the benefits each child would gain from adoption. (*In re Michael G., supra,* 203 Cal.App.4th at p. 595.)

5.    *Conclusion*

The juvenile court did not err in terminating parental rights. By the time of the section 366.26 hearing, Sarah, Kevin and Tommy looked to their caregivers to fulfill their emotional and primary needs. They had gained a family structure and a sense of safety and security with their caregivers. The juvenile court did not abuse its discretion when it determined the children would greatly benefit from the security of a stable, permanent home with committed, capable adoptive parents. (§ 366.26, subd. (c)(1)(B)(i); *Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) Thus, the record supports the conclusion there was not a "*compelling reason* for determining that termination would be detrimental" to the children. (*Bailey J.*, *supra*, 189 Cal.App.4th at p. 1315.)

II

PATERNITY STATUS AND VISITATION

A

*The Parties' Contentions*

Kevin and Tommy contend the juvenile court's orders granting Richard status as their presumed father are not supported by the evidence. They contend there is no showing Richard openly held the boys out as his own children, as required under Family Code section 7611, subdivision (d). They further argue the juvenile court erred in ordering visitation with Richard because the juvenile court did not consider their wishes and visitation would be detrimental to them.

The Agency argues the issues have been rendered moot by the subsequent termination of Richard's parental rights.

26

B

*Mootness*

An appeal becomes moot when, through no fault of the respondent, the occurrence of an event renders it impossible for the appellate court to grant the appellant effective relief. (*In re Esperanza C.* (2008) 165 Cal.App.4th 1042, 1054.) The reviewing court determines on a case-by-case basis whether subsequent events in a dependency case have rendered the appeal moot and whether its decision would affect the outcome of the case in a subsequent proceeding. (*Id.* at p. 1055.) " 'However, a reviewing court may exercise its inherent discretion to resolve an issue rendered moot by subsequent events if the question to be decided is of continuing public importance and is a question capable of repetition, yet evading review. [Citations.] We decide on a case-by-case basis whether subsequent events in a juvenile dependency matter make a case moot and whether our decision would affect the outcome in a subsequent proceeding. [Citations.]' " (*In re Anna S.* (2010) 180 Cal.App.4th 1489, 1498.)

The issues raised in Kevin and Tommy's appeal have been rendered moot by the termination of Richard's parental rights. Nevertheless, we exercise our discretion to address the question of ordering visitation on the eve of a section 366.26 hearing as a matter of continuing public importance, capable of repetition yet evading review.

C

*Visitation*

The California dependency scheme directs the juvenile court to order visitation between parent and child when placing a child in foster care and ordering reunification

27

services.  (§ 362.1, subd. (a).)  Throughout the reunification period, "[v]isitation shall be as frequent as possible, consistent with the well-being of the child."  (*Ibid.*)  If the juvenile court terminates reunification services and sets a section 366.26 hearing, the court shall continue to permit the parent to visit the child pending the hearing unless it finds that visitation would be detrimental to the child.  (§ 366.21, subd. (h).)

We review an order setting visitation for abuse of discretion.  (*In re Brittany C.* (2011) 191 Cal.App.4th 1343, 1356.)  "While the abuse of discretion standard gives the court substantial latitude, '[t]he scope of discretion always resides in the particular law being applied, i.e., in the "legal principles governing the subject of [the] action . . . ." ' [Citation.]  'Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an "abuse" of discretion.' [Citation.]" (*In re Baby Girl M.* (2006) 135 Cal.App.4th 1528, 1536.)

The circumstances here do not fall neatly within the parameters of the statutory scheme.  The juvenile court did not order visitation between Richard and the boys during the reunification period.  The first social worker's decision to allow Richard to visit the boys was made without judicial authorization.  At the time the court terminated reunification services and set a section 366.26 hearing, there was no existing visitation order; therefore, the detriment standard for continuing visitation under section 366.21, subdivision (h) did not apply.  We have not located any case law addressing the standard that applies when a parent who has had the opportunity to request visitation does not do so until after reunification services have been terminated.  Nevertheless, the record does not support a grant of visitation to Richard under either standard.

28

We conclude that the juvenile court erred when it determined the parties opposing visitation did not meet their burden to show visitation would be detrimental to Kevin and Tommy. At the time of the hearing in December 2015, Kevin and Tommy had not visited Richard since May 2014. The section 366.26 hearing was scheduled in three weeks. The record does not indicate the boys asked to see Richard or were troubled by the lack of visitation.

Detriment includes harm to the child's emotional well-being. (*Brittany C., supra*, 191 Cal.App.4th at p. 1357.) The social worker testified visitation could confuse Kevin and Tommy, create internal conflicts, and impede their attachment to their new family. Kevin was just starting to attach to his caregiver. Tommy had an attachment disorder and his indiscriminate behaviors with people presented a safety risk to him. Tommy's therapist said Tommy might not understand Richard's role in his life. Kevin's therapist said it was preferable for young children to focus on one person or couple when forming a new attachment. In view of the procedural posture of the case, the Agency and the boys clearly established that visitation with Richard would be detrimental to them.

In ordering visitation, the juvenile court relied on the past visits the boys had with Richard. The fact the boys had visits with Richard during a portion of the six-month reunification period without any apparent detriment is not relevant to determining whether reestablishing visitation would be detrimental in view of Kevin's and Tommy's current needs and circumstances. We conclude that ordering visitation for the first time on the eve of the section 366.26 hearing, with a person who had notice of the proceedings and waited a year to come forward to request visits, was not consistent with the boys'

29

well-being and was therefore an abuse of the juvenile court's discretion. (See § 300.2 [notwithstanding any other provision of law, the purpose of dependency proceedings is to ensure the safety, protection, and physical and emotional well-being of at-risk children].)

## DISPOSITION

The findings and orders terminating parental rights are affirmed.


HUFFMAN, Acting P. J.

WE CONCUR:

HALLER, J.

IRION, J.

30